**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NANCY WOODS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-01401-SRC |
| | ) | |
| THE CIRCUIT ATTORNEY'S | ) | |
| OFFICE OF THE CITY OF ST. | ) | |
| LOUIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum and Order**

Plaintiff Nancy Woods alleges that her former employer, the St. Louis Circuit Attorney's Office, fired her because of her age and race.  Woods, who is Caucasian, worked for the Circuit Attorney's Office for 28 years and was 64 years old at the time of her termination.  Woods admits that she used profanity in the workplace and that a co-worker reported to her supervisor that Woods yelled at her over a workplace dispute.  Defendants claim they fired Woods for these reasons, rather than her age or race.  Because Woods has not shown that Defendants' legitimate reasons for her termination were pretext for intentional discrimination, the Court grants [59] Defendants' Motion for Summary Judgment.

**I.     Facts and background**

**A.     Kimberly Gardner and the St. Louis Circuit Attorney's Office**

In January 2017, Defendant Kimberly Gardner became the duly elected Circuit Attorney of the City of St. Louis.  As Circuit Attorney, Gardner is responsible for "manag[ing] and conduct[ing] all criminal cases, business and proceedings of which the circuit court of the city of St. Louis shall have jurisdiction."  Mo. Rev. Stat. §56.450.  To that end, Gardner oversees the St.

1

Louis Circuit Attorney's Office—employing various assistant circuit attorneys, investigators, paralegals, and other support staff.

### B.   Nancy Woods

Woods worked for the St. Louis Circuit Attorney's Office for over 28 years.  At the time of her termination in January 2018, she was working as a paralegal assistant in the Child Support Unit (CSU).  Woods is Caucasian and, at the time of her termination, she was 64 years old.

The personnel manual of the St. Louis Circuit Attorney's Office provides in relevant part:

> The Circuit Attorney's Office relies on its employees' ethical behavior, honesty, integrity, and good judgment.  Each employee should respect the rights of others and each is responsible for his or her own actions.  *Unprofessional behavior will not be tolerated and will be subject to discipline up to and including termination.*

Doc. 61-10 (emphasis added).  Woods received and reviewed a copy of the personnel manual during her employment.

### C.   Transition to new administration

After her election, Gardner hired Defendant Robert Steele as First Assistant.  The First Assistant is responsible for handling major criminal trials and for running the Office when the Circuit Attorney is unavailable.  Steele had no prior prosecutorial experience when Gardner hired him as First Assistant.  Gardner hired Defendant Michael Warrick to be her chief of staff.  As chief of staff, Warrick was principally responsible for budgetary and personnel issues.  Gardner hired Defendant Eula Simmons as Chief Clerk.  The Chief Clerk manages all support staff at the Circuit Attorney's Office.  As Chief Clerk, Simmons was Woods's manager.  Gardner, Steele, Warrick, and Simmons are all African American.

During an all-staff meeting of the Circuit Attorney's Office after Gardner's election, Woods claims that she heard Steele say, "You people might think we're stupid because we're poor and black, but we're not."  Steele denies saying this.  Woods also claims that when she first

met Gardner, the latter introduced herself and asked Woods how long she had been working at the Circuit Attorney's Office.  When Woods said "28 years," Gardner responded, "Oh really, why are you still here?"  Gardner admits introducing herself to the staff after her election, but denies making the comment.

Gardner testified that employees of the Circuit Attorney's Office have not received formal performance evaluations during the three years since her election because her administration is still developing a new evaluation tool.

### D.     Dockery retirement and first incident of unprofessional conduct

On November 17, 2017, John Dockery retired from his position as Director of the Child Support Unit at the Circuit Attorney's Office.  Dockery, who is Caucasian, avers that Gardner told him he could either retire or be fired.  Gardner denied telling Dockery he could retire or be fired.  Steele testified that Dockery was given the option to retire or be fired because he had demonstrated unwillingness to be supervised by the incoming administration.  At the time of his retirement, Dockery had been working for the Circuit Attorney's Office for 43 years and he was 67 years old.  After Dockery's retirement, Gardner hired Diarra Cross-Davis as the new Director of the Child Support Unit.  Cross-Davis is African American, and was 44 years old when she was hired.

On the day Dockery retired, Woods became upset and loudly spoke profanities while walking up and down the halls of the Circuit Attorney's Office.  Witnesses described her as "irate" and "cursing," and recalled her saying words to the effect of "f*ck this office."  At her deposition, Woods admitted that she said "they f*cking fired John" multiple times, in an elevated tone of voice, while walking up and down the halls of the Circuit Attorney's Office.  Steele was one of the witnesses who observed Woods's outburst on November 17, 2017.

3

### E.       Meeting with Warrick and Simmons

On January 5, 2018, Warrick and Simmons met with Woods in Warrick's office. Warrick had been tasked with oversight of the Child Support Unit while the Office looked for Dockery's successor.  Accordingly, Warrick arranged individual meetings with the Child Support Unit staff to meet them and learn about their job duties.  He described the purpose of his January 5 meeting with Woods as "just trying to find out what was going on in the Child Support Unit."  It was not a disciplinary meeting.  During this meeting, Warrick and Simmons told Woods they appreciated her work and that she was performing her paralegal duties competently.

### F.       Second incident of unprofessional conduct

On January 18, 2018, Woods had a verbal altercation with Carletta Fielder, another employee in the Child Support Unit.  Fielder reported to her manager, Simmons, that Woods had confronted her in her office and yelled at her regarding a workplace issue.

Woods denies yelling at Fielder but admits that she went to Fielder's office on January 18 to discuss a workplace disagreement.  The incident arose after Fielder sent an email to the support staff in the Child Support Unit, including Woods, asking each member of the support staff to sign up for dates to cover the telephones.  The email directed that any concerns regarding the phone coverage issue should be directed to Simmons.  Woods replied to the email by signing up for telephone coverage on two of the available days.  Fielder then called Woods to tell her to sign up for additional days.  According to Fielder, she asked Woods to cover one additional telephone coverage shift that nobody else could take and Woods responded by yelling at her. Woods told Fielder that she was too busy to cover the phones on docket days (Wednesdays, Thursdays, and Fridays), but could cover on Mondays or Tuesdays.  Woods testified that while she was speaking with Fielder by phone, trying to explain why she could not take the additional

shift, Fielder hung up on her.  Woods then walked to Fielder's office to continue the conversation.

Fielder reported the confrontation with Woods to Simmons.  Simmons immediately reported what Fielder told her about the incident to Warrick.  Warrick then met with Woods to discuss the incident and told her "you will not have another outburst again in this office."  Later the same day, Warrick and Simmons met with Woods, Fielder, and another member of the support staff, Wendy Steinhauser.  Fielder testified that she told Warrick her account of the confrontation with Woods during this meeting.   During the meeting, Warrick and Simmons told Woods that her behavior was rude and unprofessional.  According to Simmons, Woods admitted that she had did not get along with Fielder and apologized for her behavior.  Woods denies that she apologized or that she had a problem with Fielder.  Simmons prepared a memorandum documenting the events of January 18 and shared the memorandum with Warrick.

### G.    Warrick's memorandum to Gardner

After the meeting on January 18, Warrick prepared a memorandum to Gardner regarding the "verbal disagreement" between Woods and Fielder.  Warrick wrote that Woods

> …indicated she was not able to cover the phones due to her work as a paralegal during Docket Days when the [Child Support Unit] attorneys are in court.  Ms. Fielder informed her if she had an issue with coverage to take her concerns up with Ms. Simmons who is over the support staff.  Ms. Fielder hung up the telephone ending the conversation.  Ms. Woods was upset and stormed down to Ms. Fielder's office where a verbal confrontation ensued with Ms. Woods raising her voice to Ms. Fielder.

Doc. 64-3.

Warrick noted in his memorandum that Woods denied yelling and denied that the conversation was a confrontation.  However, Warrick determined that Fielder's account of their interaction had "more veracity" because the conversation was loud enough to be heard down the hall, because Woods had been instructed to take complaints about the phone coverage schedule

5

to Simmons (rather than Fielder), and because of "anecdotal evidence that Ms. Woods has had loud outburst [sic] and verbal confrontations in the past." *Id.*  Warrick testified that Steinhauser told him she could hear, from her office down the hall, raised voices during the confrontation between Fielder and Woods.  During her deposition, Steinhauser denied hearing raised voices or reporting such to Warrick.  Warrick testified that his mention of "anecdotal evidence" referred to the incident when Woods used profanity in the hallways after Dockery retired.

Warrick's memorandum concludes with the following recommendation:

Reinforce to Ms. Woods that the [Circuit Attorney's Office] has a zero tolerance [sic] of verbal or physical confrontations amongst or between employees.  The matter will be taken to [Circuit Attorney] Kim Gardner for a determination of disciplinary action up to and including termination.

*Id.*

## H.     Termination

Warrick orally conveyed the contents of his memorandum to Gardner.  After that conversation, Gardner made the decision to terminate Woods's employment.  On January 26, 2018, Woods was called to a meeting with Warrick, Simmons, and Steele.  Simmons was at the meeting as Woods's supervisor.  Steele attended because, as First Assistant, he was in charge of the Child Support Unit.  Warrick led the meeting and communicated to Woods that she could either resign or be fired.  Woods chose termination.

## I.     Woods's replacement in child support unit

Approximately six months after Woods's termination, the Circuit Attorney's Office moved another staff member, K.S., from the warrant office to the Child Support Unit to take on Woods's former job duties.  K.S. is African American.  She was 47 years old and had been at the Circuit Attorney's Office for less than a year when she moved from the warrant office to the Child Support Unit.

6

**J.**     **EEOC position statement**

After her termination, Woods filed a charge of discrimination with the Equal

Employment Opportunity Commission (EEOC).  *See* Doc. 64-15.  In response, Warrick prepared

and submitted the Circuit Attorney's Office's position statement to the EEOC.  The position

statement stated that Woods was fired "for her unprofessional conduct, refusals to cooperate with

reasonable office requests, and over-all negative attitude toward the new administration of the

Circuit Attorney's Office".  *Id.*  As examples, the position statement specifically identified

Woods's use of profanity on the day Dockery retired, Woods's verbal confrontation of Fielder

about the phone coverage issue, Woods's "refusal to help" on phone coverage, and Woods's

decision to take up the phone coverage issue with Fielder despite having been instructed to

address any issues to Simmons.  *Id.*

**K.**     **Gardner's testimony**

The Parties do not dispute that Gardner is the final decisionmaker in all hiring and firing

decisions at the Circuit Attorney's Office.  Gardner's testimony regarding how she arrived at the

decision to fire Woods varies in some respects from the testimony of her own staff.

Gardner testified that both Simmons and Warrick recommended to her that Woods be

fired.  Simmons and Warrick both denied recommending Woods's termination.  Gardner testified

that Simmons made the decision to bring K.S. from the warrant office to the Child Support Unit

to replace Woods.  Simmons denied this.

Gardner testified that she relied on information provided by Warrick and Simmons about

Woods's verbal altercation with Fielder in reaching the decision to fire Woods.  Simmons denied

providing any information about the incident to Gardner.  Gardner testified that Warrick told her

Woods "cussed" at Fielder during the altercation, causing Fielder to cry and become afraid to go

back to work.  Warrick did not recall Fielder telling him that she was afraid or that Woods used profanity, and did not recall relaying such information to Gardner.

### L.    Employee terminations during Gardner's tenure

At the time Gardner took office, the Circuit Attorney's Office had 139 employees.  76% of the employees were Caucasian and 21% were African American.  Doc. 71 at ¶ 33.  The record shows Gardner has fired eleven employees during her tenure in addition to Woods, including Dockery, and Cross-Davis.  *Id.* at ¶ 20, 35-36.  Of those, nine were Caucasian (82%) and two were African American (18%).  *Id.*  Three of the Caucasian employees Gardner fired were members of the preceding administration's executive team.

## II.    Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)).  The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The proponent need not, however, negate the opponent's claims or defenses.  *Id.* at 324–25.  In response to the proponent's showing, the opponent must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" dispute of material fact is more than

"some metaphysical doubt as to the material facts." *Id.* at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable...or is not significantly probative...summary judgment may be granted."  *Id.* at 249–50 (citations omitted).

## III.    Discussion

Woods asserts claims of race discrimination, age discrimination, and civil conspiracy against Defendants the St. Louis Circuit Attorney's Office, Gardner, Steele, Warrick, and Simmons.  In Count I of her Complaint, Woods asserts claims for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq.*, and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. §213.010 *et seq*., against the Circuit Attorney's Office only.  In Count II, Woods asserts claims for age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*., and MHRA against the Circuit Attorney's Office only.  In Counts III and IV, Woods asserts claims of race discrimination against all Defendants pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1981, respectively.  Finally, in Count VI, Woods asserts a claim for civil conspiracy to deprive her civil rights against the individual defendants only.  Defendants move for summary judgment on all Counts of Woods's complaint, arguing that Woods has failed to show Defendants' legitimate reasons for her termination were pretext for age or race discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).

### A.    Race discrimination

Because the *McDonnell Douglas* framework applies to all of Woods's race discrimination claims, the Court considers them together.  Woods can survive summary

9

judgment on her race discrimination claims in two ways.  She may either "present admissible evidence directly indicating unlawful discrimination," or alternatively, she could create "an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp*." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (quoting *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009).

### 1.     Direct evidence

Woods contends that she has offered direct evidence her firing was racially motivated. "Direct evidence" "shows 'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'"  *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)).  Direct evidence of discrimination may include "remarks of the employer that reflect a discriminatory attitude," as well as "comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1128 (8th Cir. 2008).

Woods argues that Steele's statement "[y]ou people might think we're stupid because we're poor and black," was "racially hostile" and evidence of intentional discrimination.  Doc. 63 at 13.  Assuming without deciding that Steele's statement was racially hostile, the Court finds that this isolated statement is not direct evidence Woods's firing was racially motivated.  Steele made the comment at an all-staff meeting.  Woods has not shown the comment was directed to her specifically, or even to only Caucasian employees generally.  Further, Steele made the statement not long after Gardner's election in January 2017, many months before Woods's termination in January 2018.  Stray comments made many months before an adverse

employment decision are not direct evidence of intentional discrimination.  *See Bone v. G4S Youth Servs., LLC,* 686 F.3d 948, 954 (8th Cir. 2012) (comments made six months before adverse employment action were not direct evidence of discrimination); *Ramlet v. E.F. Johnson,* 507 F.3d 1149, 1153 (8th Cir. 2007) (comments made more than four months before the adverse employment action were not connected to the decision-making process and, therefore, were not direct evidence of discrimination).  Finally, "statements by nondecisionmakers" are not direct evidence of discrimination.  *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 (8th Cir. 2006).  Woods does not dispute that Gardner alone was the final decisionmaker in all firing decisions.  Thus, Steele's statement is not direct evidence of discrimination.

Woods also contends that other employment decisions at the Circuit Attorney's Office— e.g., Dockery's forced retirement and replacement by Cross, Steele's hiring, and the termination of multiple Caucasian employees in the first year of Gardner's term—are "direct evidence" that her own firing was racially motivated.  Doc. 63 at 4-5.  The Court disagrees.  Though Woods is correct that "direct evidence in this context is not the converse of circumstantial evidence," *Griffith*, 387 F.3d at 736, direct evidence must show a "*specific link* between the alleged discriminatory animus and the challenged decision."  *Id.* (emphasis added).  Evidence that other employment decisions may have been racially motivated relates to Woods's own claim, if at all, only indirectly.  Accordingly, the Court finds Woods has failed to support her claim by direct evidence.

### 2.    **Indirect evidence –** *McDonnell Douglas*

Because Woods has failed to produce direct evidence of intentional discrimination, the Court considers her race discrimination claims under the *McDonnell Douglas* burden-shifting framework.  *Gibson*, 670 F.3d at 853.  The *McDonnell Douglas* framework applies equally to

Woods's race discrimination claims under Title VII, 42 U.S.C. § 1983, 42 U.S.C. § 1981, and the MHRA.  *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010) (Title VII); *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1229 (8th Cir. 2013) (§ 1983); *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (§ 1981); *Griffey v. Daviess/DeKalb Cty. Reg'l Jail*, No. 10-06099-CV-SJ-DGK, 2012 WL 10881, at *3 (W.D. Mo. Jan. 3, 2012) (MHRA).

Under the burden-shifting analysis, a plaintiff must first establish a prima facie case of intentional discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  If the plaintiff establishes a prima facie case, a presumption of discrimination is established and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).  The defendant need not persuade the court that the articulated reason was the basis of the employer's action; rather, it must simply provide some evidence of a non-discriminatory reason or reasons for its action.  *Id.* at 510.

 Upon the proffer of such evidence, the presumption of discrimination established by the prima facie case "simply drops out of the picture." *Id.* at 510-11.  The burden then shifts back to the plaintiff to prove that the reason articulated by the employer was really a pretext for discrimination.  *Young*, 754 F.3d at 578.  A rejection of the employer's proffered non-discriminatory reason by itself or combined with elements of the prima facie case may be enough to establish, but does not compel, an inference of intentional discrimination.  *St. Mary's Honor Ctr.*, 509 U.S. at 511.

To establish a prima facie case of race discrimination, Woods must show (1) she is a member of a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of

discrimination. *Young*, 754 F.3d at 577. Defendants move for summary judgment on Woods's race discrimination claims on two independent grounds. First, Defendants argue that Woods cannot establish even a prima facie case because she has offered no evidence permitting an inference of race discrimination. Second, Defendants argue that, even if Woods could establish a prima facie case, Defendants have put forth legitimate, non-discriminatory reasons for her termination and Woods cannot show that those reasons are pretextual.

A prima facie case of discrimination "requires only a minimal showing, while a showing of pretext requires more substantial evidence." *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004). The Court need not decide whether Woods's proffered evidence constitutes even the "minimal showing" necessary to make her prima facie case because—even assuming that it does—she cannot show that Defendants' legitimate reasons for her termination were pretextual. *See Riser v. Target Corp.*, 458 F.3d 817, 820-21 (8th Cir. 2006) (where employer has proffered legitimate, non-discriminatory reasons for adverse employment action, court may skip analysis of prima facie case and move directly to question of discrimination *vel non*).

Defendants have offered legitimate, non-discriminatory reasons for Woods's termination. Woods admits that she loudly and repeatedly said "they f*cking fired John" in the hallways of the Circuit Attorney's Office on the day Dockery retired. Woods admits that Fielder told her supervisor that Woods yelled at her regarding a workplace issue. In their EEOC position statement, Defendants specifically identified both of these incidents as reasons for Woods's termination. The Circuit Attorney's Office personnel manual, which Woods received and reviewed, states that unprofessional behavior will be subject to discipline up to and including termination. Violation of company policy is a legitimate, non-discriminatory reason for termination. *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011). Accordingly,

13

Defendants have met their burden to offer legitimate, non-discriminatory reasons for Woods's firing.

Because Defendants offer legitimate reasons for her termination, Woods bears the burden to show those reasons were pretextual. *Young*, 754 F.3d at 578. "A plaintiff may show pretext, among other ways, by showing that an employer … treated similarly-situated employees in a disparate manner." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). A plaintiff may also show pretext with "evidence that an employer has proffered an explanation with no basis in fact, with evidence that the plaintiffs recently received favorable reviews, or with evidence that the employer's proffered reason for its employment decision has changed substantially over time." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008). Woods contends that she has offered evidence of pretext in each of these ways.

### a.    Comparator

Woods argues Defendants' reasons are pretextual because she was fired while Fielder (who is African American) was not, even though there is evidence both raised their voices during their verbal confrontation. "At the pretext stage, the test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1126 (8th Cir. 2017). The employee "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Bone*, 686 F.3d at 956). The Court finds that Fielder is not a similarly situated comparator. Even though Woods and Fielder shared a supervisor and were both subject to the personnel policy, significant distinguishing circumstances exist. Unlike Fielder, Woods admittedly had a prior incident of unprofessional conduct. Woods admits that she previously used profanity, in a raised voice, in

14

the halls of the Circuit Attorney's Office.  Woods offers no evidence that Fielder engaged in similar behavior.  Thus, the fact Fielder was not also fired is not evidence of pretext.  *See Edwards*, 860 F.3d at 1126 (comparator must have "engaged in the same conduct without any mitigating or distinguishing circumstances").

### b.    Factual basis for termination

Woods also argues that Defendants' proffered reasons for her termination have no basis in fact, and are thus pretextual.  The Court disagrees.  As noted above, Defendants have articulated at least two legitimate, non-discriminatory reasons for Woods's firing: using profanity the day Dockery retired and yelling at Fielder during their verbal confrontation.  Woods has failed to show that either of these reasons has "no basis in fact."  *Morris*, 512 F.3d at 1019.

As to the first, Woods admits that she loudly and repeatedly said "they f*cking fired John" in the hallways of the Circuit Attorney's Office the day Dockery retired.  However, Woods argues that this infraction "could be viewed as minor," Doc. 63 at 11, because Steele observed it at the time but took no action, and because Warrick and Simmons did not address it during their January 5 meeting with Woods.  But "[t]he wisdom of a company's decision to terminate its employee for what this Court may regard as a frivolous reason is not an issue in a Title VII case."  *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 637 (8th Cir. 2000).  In Missouri, at-will employees may be terminated for "any reason or no reason as long as the termination is not otherwise unlawful."  *Greeno v. Little Blue Valley Sewer Dist.*, 995 F.2d 861, 864 (8th Cir. 1993).  Woods admits she used profanity in the workplace, in violation of office policy, so she has failed to show that this reason for her termination has no basis in fact.

Defendants' second proffered reason for Woods's termination is that Woods yelled at Fielder during their verbal confrontation over phone coverage.  Woods admits the conversation

with Fielder occurred.  Woods also admits Fielder reported to Simmons that Woods yelled at her, but denies actually doing so.  Woods argues that she did not yell at Fielder, so this reason for her termination has no basis in fact and is pretextual.

In *Stuart*, the Eighth Circuit considered an analogous case in which the plaintiff disputed the facts underlying her termination and thereby argued pretext.  217 F.3d at 636.  The Court stated that the plaintiff's "denial of the facts upon which her termination was based, standing alone… is not evidence that [the employer]'s stated reason was a pretext" because "the veracity of the facts" was not the "core question."  *Id.* at 637.  Rather, the core question concerned whether "the employment decision was based upon intentional discrimination."  *Id.*  Thus, the Eighth Circuit affirmed summary judgment for the employer because (1) the individual who investigated and reported the events to the decisionmaker believed his report to be accurate, and (2) the decisionmaker relied on that report and "did not possess any other evidence contradicting the accuracy of the report."  *Id.*

Here, Warrick investigated the events and reported them to Gardner, who made the decision to terminate Woods.  Woods argues that Warrick did not actually investigate, so he had reason to know his report was not accurate.  Doc. 63 at 9.  The Court disagrees.  Woods does not dispute that Warrick spoke to her about the incident.  Woods also does not dispute that Fielder reported the incident to Simmons, who relayed that report to Warrick.  Further, Fielder testified that she told Warrick what happened during the January 18 meeting.  Thus, the record does not support Woods's contention that Warrick's investigation "never took place."  *Id.*

At most, the record indicates that Warrick's investigation was imperfect.  Warrick testified that Steinhauser told him she heard raised voices, but Steinhauser denied this.  Warrick apparently did not interview any other witnesses (except Fielder) who heard raised voices.

16

Warrick's report states that he credited Fielder's account over Woods's for three reasons: (1) Woods's prior outburst (i.e., her use of profanity when Dockery retired), (2) Woods's defiance of the instruction to address the phone coverage issue with Simmons instead of Fielder, and (3) Steinhauser's (alleged) testimony regarding raised voices. Even if Steinhauser's testimony is discounted, the Court finds no genuine issue of material fact as to whether Warrick believed his report to be accurate.

Warrick orally conveyed the report of his investigation to Gardner. Relying on the report, Gardner made the decision to fire Woods. Woods offers no evidence that Gardner possessed "any other evidence contradicting the accuracy of [Warrick's] report." *Stuart*, 217 F.3d at 637. Accordingly, Woods has failed to create a genuine issue of material fact that this reason for her termination was pretext for discrimination.

### c.     Recent favorable review

Woods next argues that Defendants' reasons for her termination were pretextual because she had recently received a favorable review. Woods acknowledges that she had not received a formal performance review at least since the start of Gardner's term in January 2017, which Gardner explained was due to not having developed a new performance-evaluation tool since she took office. Doc. 63 at 8. However, Woods argues that her January 5, 2018 meeting with Simmons and Warrick was a recent favorable review because Warrick told her she was performing her paralegal duties competently. The Court assumes without deciding that the January 5 meeting was a recent favorable review. Regardless, "evidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination." *Main v. Ozark Health, Inc.*, 959 F.3d 319, 326 (8th Cir. 2020). Where the "culminating event" leading to an employee's termination occurs after the favorable review, the review is not evidence of

17

pretext.  *Id.*; *see also Lindeman v. Saint Luke's Hosp. of Kansas City*, 899 F.3d 603, 607 (8th Cir. 2018) (noting that the favorable review was made prior to the conduct justifying termination and finding that "a review issued without that knowledge is irrelevant to whether [the employee] was actually terminated for the given reason").

Here, the culminating event leading to Woods's firing was her confrontation with Fielder on January 18, after the January 5 meeting with Simmons and Warrick.  Further, Woods has not shown that either Simmons or Warrick was aware on January 5 of her prior outburst in response to Dockery's retirement.  Accordingly, the January 5 meeting does not create a genuine issue of fact that either of Defendants' proffered reasons for Woods's firing is pretextual.

### d.    Shifting justifications for termination

Woods next argues that Defendants' reasons for her termination have changed over time, showing that those reasons are pretextual.  "A change in an employer's legitimate, nondiscriminatory reason for firing an employee is probative of pretext only if the discrepancy is 'substantial.'"  *Bone*, 686 F.3d at 957.  To the extent Defendants' reasons for Woods's termination have changed at all, the Court finds any such change insubstantial.

Warrick's report to Gardner identified the relevant issue as "whether the verbal altercation between Ms. Woods and Ms. Fielder was initiated by Ms. Woods [and] amounted to a confrontation," and, if so, whether it was "unprofessional behavior warranting disciplinary action."  Doc. 64-3.  Per the report, Warrick based his decision to believe Fielder's account over Woods's in part on "anecdotal evidence that Ms. Woods has had loud outburst [sic] and verbal confrontations in the past."  *Id.*  Warrick testified that this "anecdotal evidence" was Woods's use of profanity the day Dockery retired, conduct Woods herself admitted.  Gardner made the decision to terminate Woods based on Warrick's report.

In response to Woods's EEOC complaint, Defendants' stated in their position statement that Woods was terminated "for her unprofessional conduct, refusals to cooperate with reasonable office requests, and over-all negative attitude toward the new administration of the Circuit Attorney's Office". *Id.* As examples, the position statement specifically identified Woods's use of profanity on the day Dockery retired, Woods's verbal confrontation of Fielder about the phone coverage issue, Woods's "refusal to help" on phone coverage, and Woods's decision to take up the phone coverage issue with Fielder despite having been instructed address any issues to Simmons. *Id.*

Woods argues that Defendants' reasons for her termination have changed substantially in that Defendants have, for summary judgment purposes, "abandoned" their claim that Woods refused to help with phone coverage, and because Defendants did not claim they fired Woods for her Dockery outburst or for disobeying an instruction to address issues with phone coverage with Simmons until after Woods's EEOC complaint. The Court disagrees. Warrick's report, though principally focused on the issue of whether Woods acted unprofessionally by yelling at Fielder, specifically notes that Fielder told Woods to address phone coverage issues to Simmons. Warrick's report also mentions the "anecdotal evidence" of a prior outburst, referring to the Dockery incident. Thus, these issues were mentioned in both Warrick's report and the position statement.

Defendants have consistently represented that Woods was fired for unprofessional conduct. Accordingly, any change in Defendants' reasons for Woods's termination was insubstantial. *See McCullough v. Univ. of Arkansas for Med. Sciences,* 559 F.3d 855, 863 (8th Cir. 2009). Finally, the Court finds no merit in Woods's contention Defendants "abandoned" their claim she refused to help with phone coverage. Defendants' summary judgment burden

was to identify any legitimate, non-discriminatory reason for Woods's termination. Defendants have met that burden. Defendants' choice not to address other reasons at the summary judgment stage is not evidence of pretext.

> ### e.  Other employment decisions

Finally, the Court considers whether Woods's evidence regarding other employment decisions in the Circuit Attorney's Office creates a genuine issue of fact as to pretext. Woods offered evidence that Gardner forced Dockery to retire and replaced him with Cross-Davis, a younger, less-experienced, African American attorney. Woods argues that Steele was unqualified because he lacked prosecutorial experience before being hired as Gardner's First Assistant. Woods argues K.S. was likewise unqualified to replace her as a paralegal assistant in the Child Support Unit. Finally, Woods offers certain statistical evidence. The record shows that the Circuit Attorney's Office was 76% Caucasian and 21% African American when Gardner took office. Other than Woods, Gardner has fired eleven employees: nine Caucasian and two African American.

"[I]t is not the role of this court to sit as a 'super-personnel department' to second guess the wisdom of a business's personnel decisions." *Ward v. Int'l Paper Co.*, 509 F.3d 457, 462 (8th Cir. 2007). Apart from noting the race (and age) of the individuals involved, Woods offers nothing to show that discriminatory animus played a role in any of these employment decisions. Woods "must do more than merely point to race and proclaim: 'Aha! Discrimination.'" *Hague v. Thompson Distribution Co.,* 436 F.3d 816, 829 (7th Cir. 2006). At the pretext stage, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone*, 686 F.3d at 956. Woods has not shown—or even attempted to show—that any of these other employment decisions is a valid comparator to her own.

Likewise, Woods not shown that her statistical evidence is probative of pretext. "[I]n order for statistical evidence to be probative of pretext, it must analyze the treatment of comparable employees." *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 958 (8th Cir. 2001); *see also Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir. 1994) ("For the statistical comparison to be probative in persuading the trier of fact on the ultimate issue of discrimination, [plaintiff] must establish that the Caucasian employees who were [purportedly treated differently] were 'similarly situated in all relevant respects' to the African–American employees."). Woods makes no showing that any of the other eleven employees fired by Gardner were comparable to herself.

Even if Woods had made such a showing, the proffered statistical evidence cannot support a finding of pretext. When Gardner's term began, the Circuit Attorney's Office had 139 employees. 76% were Caucasian and 21% were African American. The record shows Gardner has fired, in addition to Woods, eleven other employees during her tenure. Of those, nine were Caucasian (82%) and two were African American (18%). These percentages vary only minutely from what would be expected if the terminations occurred at random. Adjusting for the political (and, absent more, not racially-discriminatory) reality that three of the terminated Caucasian employees were political appointees of Gardner's predecessor, the minute variances become miniscule: six Caucasian (75%) and two African American (25%). Given the small sample size, and insignificant variances, the Court finds the statistical evidence does not support a finding of pretext.

Woods has failed to show that Defendants' legitimate, non-discriminatory reasons for her termination were pretextual. Accordingly, the Court grants Defendants' motion for summary judgment on Woods's claims of race discrimination.

B.      Age discrimination

Woods also asserts claims for age discrimination in violation of the ADEA and MHRA. As with her race discrimination claims, Woods may show age discrimination by either direct or indirect evidence. *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1331–32 (8th Cir. 1996).

Woods contends that she has provided direct evidence of age discrimination, but the only relevant evidence she identifies are Dockery's replacement by a younger attorney, and her own replacement by K.S. For the same reasons as above, the Court finds that evidence of these other employment decisions relates to Woods's own termination, if at all, only indirectly.

Woods also offers evidence that, when she told Gardner she had been at the Circuit Attorney's Office for 28 years, Gardner responded, "Oh really, why are you still here?" "Length of tenure, although it may correlate empirically with age, is not synonymous with age." *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 725 (8th Cir. 2001). Thus, comments regarding an employee's tenure are not direct evidence of age-based animus. *Id.* Gardner's comment was a reaction to Woods's statement of her tenure, not her age. Accordingly, Gardner's comment is not direct evidence of age discrimination.

Where a plaintiff relies on indirect proof of discrimination, the Court analyzes both ADEA and MHRA claims of age discrimination under the *McDonnell Douglas* burden-shifting framework. *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 964 (8th Cir. 2006). As with her race discrimination claim, the Court need not decide whether Woods has established a prima facie case of age discrimination because Woods has failed to show that Defendants' non-discriminatory reasons for her termination were pretextual. Woods relies on the same showing of pretext for her age discrimination claims as her race discrimination claims. Doc. 63 at 6-16. Because this evidence fails to show pretext, Woods's age discrimination

22

claims—like her race discrimination claims—fail at the final prong of the *McDonnell Douglas* analysis. The Court thus grants summary judgment for Defendants on Woods's claims of age discrimination under the ADEA and MHRA.

### C.     Conspiracy

Finally, Woods asserts a claim of civil conspiracy to violate her civil rights, in violation of 42 U.S.C § 1983. To succeed on a § 1983 conspiracy claim, a plaintiff must show: "that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999).

Defendants argue for summary judgment on Woods's conspiracy claim because Woods has failed to show any constitutional violation. A plaintiff is "required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Henry v. Johnson*, 950 F.3d 1005, 1015 (8th Cir. 2020) (quoting *Askew*, 191 F.3d at 957 (8th Cir. 1999)). Thus, the Court's grant of summary judgment on Woods's claims of race and age discrimination also "dictates the result" of her conspiracy claim. *Id.* Because Woods has failed to show any constitutional violation, her conspiracy claim fails as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that [59] Defendants' Motion for Summary Judgment is GRANTED.

So Ordered this 28th day of July, 2020.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**